UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

TERRY BACCUS,

    Defendant.

Case No. 3:20-cr-130

District Judge Michael J. Newman

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS (DOC. NO. 18)**

Defendant Terry Baccus is charged in a single count indictment with being a felon in possession of a firearm. Doc. No. 2. This case is before the Court upon Defendant's motion to suppress (doc. no. 18), the Government's response (doc. no. 24), the record and evidence admitted during a hearing on Defendant's motion (doc. no. 27), and the parties' post-hearing memoranda (doc. nos. 29, 30, 31).

### I.    Background

In the early morning hours of October 19, 2019, Dayton police officers Dorian Mercer and David Lane were patrolling the west side of Dayton in a marked police cruiser. Doc. No. 27 at PageID 74. Officer Mercer was driving. *Id*. at 94. During the suppression hearing, Officer Mercer testified that, based on his experience, he thought the west side of Dayton is a high crime area. *Id*. at 96. He also understood the west side of Dayton had a reputation for having more crime than other areas of Dayton. *Id*.

At approximately 2:00 a.m., the officers noticed a gray four-door Pontiac Grand Prix ("Grand Prix") parked on West Grand Avenue. *Id*. at 74, 96; Defendant's Exhibit A. Officer

Mercer described the neighborhood as a residential area with houses on both sides of the street. *Id*. at 97. Officer Mercer testified the Grand Prix was "impeding traffic. It was just in the middle of the street." *Id*. at 75. As they drove past the Grand Prix, the officers could not tell if anyone was inside. *Id*. at 99. Officer Mercer noticed the vehicle's engine running, a conclusion he based on seeing "the exhaust was running." *Id*. at 75.

After passing the Grand Prix, Mercer turned the cruiser around, pulled up behind Grand Prix, and parked. *Id*. at 74-75. One of the officers turned on the cruiser's video camera. *Id*. at 100. The resulting video recording was admitted into evidence during the suppression hearing. Counsel for both the Government and Defendant played the video and questioned Officers Mercer and Lane about the recorded events.

Officer Mercer testified that the officers approached the Grand Prix to investigate why it was impeding traffic. *Id*. at 78. Before exiting the cruiser, the officers did not turn on its emergency lights. *Id*. at 100. As they walked toward the Grand Prix, each officer used a flashlight to illuminate its interior. *Id*. at 103. Officer Mercer walked on the driver's side of the Grand Prix; Officer Lane walked on the right passenger's side. *Id*. at 77. Neither officer saw a weapon or any narcotics inside the vehicle. *Id*. at 106, 152. However, both officers saw a man -- Defendant -- reclining in the driver's seat of the Grand Prix. *Id*. at 79. Officer Mercer testified that Defendant was "sweating"; Officer Lane testified that Defendant was "sweating profusely." *Id*. at 79, 161-62.

Officer Mercer thought Defendant was unconscious, although Officer Mercer acknowledged, "[s]omeone who is asleep might also look unconscious but just actually be sleeping," and "you can't look at somebody who's sleeping and determine consciousness." *Id*. at 105. Officer Mercer also acknowledged he did not need to do anything to revive Defendant into

consciousness. *Id*. at 104-05. The officers did not attempt to wake Defendant by knocking on the windows of the Grand Prix. *Id*. at 106. Officer Lane testified, "[Defendant] appeared to be unconscious. He was sweaty. He didn't seem to be awake or anything." *Id*. at 139.

Officer Lane opened the passenger side door, reached into the Grand Prix, turned the engine off (by turning the ignition key), and removed the keys from the ignition. *Id*. at 105-06 163-64. Officer Lane testified, "I felt at this time since the [Grand Prix's] door was unlocked, the safest option for the general public and myself and Officer Mercer was to remove the keys just in case Mr. Baccus was startled and decided to flee the stop." *Id*. at 143. Officer Lane noted he was also prepared to check on Defendant's sobriety. *Id*. Officer Lane explained, "I would say that in my experience, it's odd for somebody to be in the middle of the roadway -- parked or either stopped in their vehicle. It's also strange for them to be sleeping there and sweating profusely." *Id*.

During the suppression hearing, Government's counsel asked Officer Lane, "[I]n your training and experience, had you startled Mr. Baccus awake, what was the danger that you were worried about?" *Id*. at 144. Officer Lane answered,

> Due to the fact that he [Defendant] could easily place the car in drive, I felt like if he was impaired or if there was something going on, that he -- or something going on with his intoxication or something else, he might just suddenly decide to pull forward or pull away from the stop and potentially harming other citizens in the area or himself or possibly us as well ….

*Id*. at 144-45.

Defendant awoke when the Grand Prix's engine shut off. *Id*. at 109. Defendant seemed "startled," and he reached first for the gear shifter then for the ignition. *Id*. at 108-09. At this point, Officer Mercer intended to get Defendant out of the Grand Prix and question him. *Id*. at 109. One of the officers asked Defendant if he had any weapons or anything they needed to know about. *Id*. at 110-11, 165. Defendant did not tell the officers that he had a firearm. *Id*. at 111.

3

Officer Mercer opened the driver's side door of the grey Pontiac and asked Defendant to step out and raise his arms above his head. *Id*. As Defendant did so, he kept moving his right hand towards the waistband of his pants, according to Officer Mercer. *Id*. at 84. Officer Mercer again asked Defendant if he had anything on him. In response, Defendant "immediately placed his right arm down to his waistband area again…." *Id*. Officer Mercer moved Defendant's arms back up. *Id*. at 84-85.

Officer Mercer began patting down Defendant's outer clothing and felt what he thought was the handle of a firearm in Defendant's front right waistband. *Id*. at 85. Consequently, Officer Mercer handcuffed Defendant's hands behind his back. *Id*. at 86, 116. Officer Mercer explained he did this "[f]or the safety of everyone," *id*. at 86, "[d]ue to feeling that firearm." *Id*. Officer Mercer then removed a gun from Defendant's front right waistband and placed it on the Grand Prix's trunk. *Id*. at 87, 150. The police report written by Officer Mercer documents that the gun was a Ruger P95 9mm with a magazine and 13 rounds. *Id*. at 122, Defendant's Exh. A.

Before the officers placed Defendant in the police cruiser, Officer Mercer performed a more thorough pat down search and found a gun holster. *Id*. at 86. The officers then placed Defendant in the cruiser's back seat. *Id*. Before taking him to jail, either Officer Mercer or Lane wrote him a citation for impeding traffic. *Id*. at 129. The police report lists Defendant's arrest charges, in part, as carrying a concealed weapon, having a weapon while under a disability, and improperly handling of a firearm in a motor vehicle. *Id*. at Defendant's Exh. A.

In the present case, Defendant contends that Officer Lane's warrantless entry into the Grand Prix and Officer Mercer's pat down search violated his rights under the Fourth Amendment. Defendant seeks an Order suppressing all tangible evidence seized by the Government, and any statements he allegedly made.

## II.     The Fourth Amendment

The Fourth Amendment forbids "unreasonable searches and seizures" and provides, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. art. IV. "'It is well settled under the Fourth Amendment that a warrantless search is *per se* unreasonable subject only to a few specifically established and well-delineated exceptions.'" *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quoting *Morgan v. Fairfield Cty.*, 903 F.3d 553, 560-61 (6th Cir. 2018) (cleaned up).

A defendant may assert a violation of the Fourth Amendment and seek suppression of evidence by filing a pretrial motion. *See* Fed. R. Crim. P. 12(b)(3)(C). A defendant seeking suppression of evidence bears the burden to show "a violation of some constitutional or statutory right justifying suppression.'" *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman,* 606 F.2d 673, 679 n. 11 (6th Cir. 1979)).

"The exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment, as well as derivative evidence acquired as a result of an unlawful search." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (*citing Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).

## III.    Analysis

**A.     The Stop**

The Government contends the officers' observations were reasonable and appropriate under the circumstances presented here. Doc. No. 24 at PageID 58. Relying on those observations and conditions, the Government contends that probable cause supported the conclusion that a traffic violation (impeding traffic) was occurring, and the officers had reasonable, articulable

suspicion to investigate whether criminal activity (impaired driving) was occurring. *Id*.

Defendant does not directly challenge these contentions. Doc. No. 18; Doc. No. 29, PageID at 180-86; Doc. No. 31 at PageID 217. Consequently, the parties' controversy focuses first on Officer Lane's warrantless entry into the Grand Prix and second on Officer Mercer's pat down search of Defendant after he exited the Grand Prix.

**B.      Warrantless Entry Into The Grand Prix**

Defendant argues, "there was not a sufficient legal basis for the warrantless entry into [my] vehicle, thus any subsequent observations and evidence obtained following said entry was the result of an unlawful search and seizure in violation of the United States Constitution." Doc. No. 29, PageID at 181. Defendant maintains that Officer Lane's warrantless entry into the Grand Prix, without at least trying to wake Defendant before intruding into the vehicle, "was unreasonable and is different than ordering someone out of a vehicle to effectuate a stop." Doc. No. 31 at PageID at 219. Defendant contends that Officer Lane's decision to enter the Grand Prix and remove the keys from the ignition was based on his hunch that Defendant would put the car in gear and either drive away or injure the officers. *Id*. at 221 (quoting Doc. No. 29 at PageID 42, 78).

The Government contends Officer Lane's entrance into the Grand Prix -- and his subsequent acts of turning off the ignition and taking the keys to effectuate Defendant's seizure -- was reasonable under the circumstances and therefore did not violate the Fourth Amendment. Doc. No. 30 at PageID 192. The Government reasons that Officer Lane's seizure of the keys "was a reasonable means of physical restraint by which he could ensure that [Defendant] would not leave the area pending the conclusion of the officers' investigation." *Id*. at 192-93.

As indicated above, Defendant does not dispute the existence of probable cause to support the conclusion that a traffic violation (impeding traffic) was occurring. He also does not dispute

the officers had reasonable, articulable suspicion to investigate whether criminal activity (impaired driving) was occurring. *Supra* § III(A). Thus, the inquiry into Officer Lane's removal of the keys from the Grand Prix becomes, " 'whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the [officers'] conduct given their suspicions and the surrounding circumstances.' " *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012) (quoting *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). "An investigative detention is reasonable in scope if the detention was sufficiently limited in time and the investigative means used by the officers involve the least intrusive means reasonably available." *Id*.

Officer Lane's conduct in opening the passenger door of the Grand Prix, reaching inside, turning off the engine, and removing the key was reasonable given the officers' suspicions and the surrounding circumstances. The Grand Prix was illegally parked in a high crime area at 2:00 a.m. The officers observed Defendant sweating a great deal (even though it was October), and either sleeping or unconscious in the Grand Prix's driver's seat. In these circumstances, it was objectively reasonable for the officers to investigate whether Defendant had been driving under the influence of drugs or alcohol and whether he needed medical assistance. Additionally, Officer Lane did not conduct a search for evidence while he reached inside the Grand Prix, and his conduct in turning off the Grand Prix's engine, removing the keys, and immediately withdrawing constituted a minimal intrusion into the vehicle and was limited in scope to its purposes -- to prevent Defendant from leaving before the officers completed their investigation, and to protect the officers and public from harm if Defendant drove away in an impaired state. *See id*.; *cf. United States v. Herbin*, 343 F.3d 807, 810 (6th Cir. 2003) ("[Officers] drew their weapons, seized the occupants, and removed the key from the ignition of Ms. Thompson's car. The agents already had

7

authority to seize, at least temporarily, the vehicles and their occupants based on probable cause to believe traffic laws had been violated").

Defendant contends the officers' conduct was not "the least intrusive means reasonably available" to them because they could have attempted to wake Defendant by knocking on the windows of the Grand Prix. Yet, this option was not reasonably available to the officers given the danger it would pose if Defendant woke up and suddenly drove away. In contrast, it was reasonable for Officer Lane to minimally intrude into the Grand Prix in a way that minimized, and in fact prevented, any danger to the officers or public.

Defendant points out there was no odor of alcohol near him or the Grand Prix and no visible evidence of drugs or drug paraphernalia in or near the Grand Prix. Doc. No. 31 at PageID 221. Defendant asserts that the officers had only the parking violation to support their initial decision to investigate, and Officer Lane's decision to intrude into the Grand Prix was based on his mere hunch that Defendant might drive away. *Id*. However, this overlooks the fact that the Grand Prix's engine was running and Defendant was sweating profusely and either sleeping or unconscious at 2:00 a.m. in a high crime area. Given these facts, it was a realistic possibility, rather than a hunch, that Defendant might drive away and place the officers or the public in peril.

**C.     Pat Down Search**

Defendant next argues that Officer Mercer violated his rights under the Fourth Amendment by performing a pat down search without a reasonable, articulable suspicion that Defendant was carrying a weapon. Defendant emphasizes he promptly and respectfully responded to Officer Mercer's instruction to exit the Grand Prix and to Officer Mercer's questions, but Officer Mercer quickly initiated a pat down search in a manner that showed he "had already decided that he was

8

going to *Terry*[1] frisk [Defendant] before he got out of the vehicle." Doc. No. 31 at PageID 225.

The Government argues that Officer Mercer had reasonable, articulable suspicion that Defendant was armed based on his behavior when he first awoke in the Grand Prix and after he exited the Grand Prix.

"[A]n officer who has a reasonable, articulable suspicion that criminal activity is afoot, may conduct a brief investigatory stop and may search that individual in the interest of officer safety." *United States v. Jeter*, 721 F.3d 746, 755 (6th Cir. 2013) (citing *Terry,* 392 U.S. at 21-23). "Reasonable suspicion exists where the officer can articulate specific, particularized facts that amount to more than a 'hunch.' " *Id*. (citing *Terry*, 392 U.S. at 27). "Ultimately, the test is whether 'a reasonably prudent [person] in the circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.' " *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (quoting *United States v. Noble*, 762 F.3d 509, 521-22 (6th Cir. 2014)); *see Terry,* 392 U.S. at 27.

"[T]he determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) (citation omitted).

The video recording (by the camera in Officer Mercer's police cruiser) reveals that Defendant exited the Grand Prix in a cooperative manner and that Officer Mercer quickly performed a pat down search of Defendant's outer layer of clothing. *See* Doc. No. 27, Gov't Exh. 1 at 2:20-23. But, there was more going on in this situation, and additional acts by Defendant provided Officer Mercer with reasonable, articulable suspicion to think that he might be carrying a weapon in the waistband of his pants.

---

[1] *Terry v. Ohio*, 392 U.S. 1 (1968).

Recalling that Defendant woke inside the Grand Prix after Officer Lane removed the keys from the ignition, Officer Mercer saw Defendant immediately reach for the gear shift and then for the keys in the ignition. Doc. No. 27 at PageID 82. These actions, after Defendant was startled awake, did not suggest that he was armed. Yet, Officer Mercer next saw Defendant begin to touch "the top of his chest all the way down to the -- his waistband." *Id*. The fact that Defendant stopped touching himself when he reached his waistband suggested that, having lost his keys, he might have been checking to see if he also lost his weapon. Certainly, Defendant could have been innocently looking for his keys. But the totality of circumstances warranted cautious action by Officer Lane, including that the officers found Defendant sleeping in his illegally parked car at 2:00 a.m. with the engine running in a high-crime area. *See Wardlow*, 528 U.S. at 125 ("*Terry* recognized that the officers could detain the individuals to resolve the ambiguity…," between innocent conduct and criminal behavior); *cf. United States v. Luqman*, 522 F.3d 613, 617 (6th Cir. 2008) ("while the criminal patterns in an area will not alone justify a stop, they are a factor that law enforcement can consider").

Officer Mercer testified that as Defendant exited the Grand Prix, he kept his right hand close to his waistband while his left hand was moving freely while exiting the vehicle. Doc. No. 27 at PageID 83-84. Officer Mercer also testified, "When I asked if he had anything on him, he immediately placed his right arm down to his waistband area again. I immediately placed his arms back up." *Id*. at 84. These actions -- combined with Defendant's previous check of his waistband while in his vehicle, his act of keeping his right hand close to his waistband when exiting his vehicle, and his presence in an illegally parked car at 2:00 a.m. in a high crime area -- added up to reasonable, articulable suspicion for Officer Mercer to believe that Defendant might have a weapon in the waistband of his pants. Indeed, " 'a reasonably prudent person in the

10

circumstances would be warranted in the belief that his [or her] safety or that of others was in danger.' " *Pacheco*, 841 F.3d at 390.  Accordingly, under these circumstances, Defendant's pat down did not violate the Fourth Amendment.

## IV. Conclusion

For all of the above reasons, Defendant's motion to suppress (doc. no. 18) is **DENIED**.

**IT IS SO ORDERED.**

<u>August 16, 2021</u>                                                          <u>s/Michael J. Newman         </u>
                                                                            Hon. Michael J. Newman
                                                                            United States District Judge